IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMUNITY ASSOCIATION | : | |
| UNDERWRITERS OF AMERICA, INC. | : | |
| A/S/O PARK VIEW AT WAVERLY, A | : | |
| CONDOMINIUM | : | |
| C/O PMI MANAGEMENT | : | |
|     Plaintiff | : | Civil Action No.:  1:09 CV 0257 |
| | : | |
|    v. | : | |
| | : | |
| RHODES DEVELOPMENT GROUP, | : | The Honorable Sylvia H. Rambo |
| INC. A/K/A RHODES DEVELOPMENT | : | |
| CORP. A/K/A R&L CONSTRUCTION | : | |
| COMPANY, ADAMS DRYWALL, | : | |
| PEDRO YAHUITL QUINTERO and | : | |
| ALAN BARB | : | |
|     Defendants | : | |

## DEFENDANT, PEDRO QUINTERO'S MOTION FOR SUMMARY JUDGMENT

Comes Now, Defendant, Pedro Quintero, by and through his undersigned counsel, who hereby moves this Honorable Court for summary judgment pursuant to Federal Rule of Civil Procedure 56, and in support thereof avers the following:

1.  This case involves a subrogation claim on behalf of Community Association Underwriters of America, Inc. (hereinafter "CAUA"), a company which represents itself as being one of the largest insurance providers in the United States, exclusively serving community associations, residential and office condominiums, cooperative apartments and homeowners associations.

2.  In this action, CAUA seeks to recover payments made to Park View at Waverly, a Condominium, arising out of a fire which occurred on March 4, 2008 that

caused damage to several units in the 6-unit residential building located on Park

View in Swatara Township, Dauphin County, Pennsylvania.  The fire was reported to

the authorities at approximately 6:34 a.m.   See deposition of Fire Marshal George

Drees at p.10.  A true and correct copy of the deposition transcript of George Drees is

attached hereto and marked as Exhibit "A".

3.     Units in the involved building were numbered 411, 413, 415, 417, 419

and 421.  Units 415 and 417 were vacant, but Unit 417 was in the process of being

completed for eventual occupancy.  Unit 417 was the most heavily damaged by the

fire and appears to be the unit where the fire originated.

4.     On the day immediately prior to the fire, the only construction work

being actively performed in Unit 417 was dry walling.

5.     The condominium complex was originally owned and developed by

Waverly Woods Associates (hereinafter "Waverly Woods").

6.     Waverly Woods entered into an AIA Standard Form of Agreement

between owner and contractor with R&L Construction Company (hereinafter

"R&L") on December 1, 2005, whereby R&L was to be the general contractor for

construction of the condominium units.

7.     On January 23, 2008, R&L entered into a written subcontract with

Adams Drywall, Inc. (hereinafter "Adams") whereby Adams was to install drywall in

the units of Phase 7 of Park View at Waverly, which included the subject unit in question.

8.     Thereafter, Adams entered into oral subcontracts with Alan Barb (hereinafter "Barb") and Pedro Quintero (hereinafter "Quintero") whereby the latter two individuals would perform all of the drywall work contracted to be performed by Adams.

9.     The work to be performed by Quintero is what is commonly referred to as "finish" work, which involves placing tape over the joints between the abutting sheets of drywall after they have been hung and then applying joint compound over the joints in three separate applications, usually over the course of three days in order to allow each coat of compound to properly dry before the next coat is applied. Joint compound is similar to plaster and requires a period of time to dry.

10.     In a structure that is otherwise unheated, a source of heat is typically used to prevent the drywall from freezing and cracking during periods of cold weather.

11.     In the present matter, it is undisputed that R&L provided propane-fired portable heaters and tanks of propane gas to be used by the various subcontractors, including Quintero.

12.     These propane-fired portable heaters were used by the drywall finishers to keep the units at a temperature above freezing as needed during the day and

overnight. Typically, the heaters would be left on overnight as there was no auxiliary source of heat in the unit during the dry walling process.

13.    In his Answer with Affirmative Defenses, Defendant, Quintero, raised as one of his affirmative defenses the Doctrines of Spoliation of Evidence against Plaintiff. It is submitted that plaintiff, experts of plaintiff, and other representatives of plaintiff contaminated the fire scene which prevented Quintero's experts from being able to fully evaluate the fire scene and determine the origin and cause of the fire.

14.    Fire Marshal George Drees was present at the outset of the fire and remained at the fire scene until approximately 12:30 p.m. on March 4, 2008. Fire Marshal Drees testified that he was able to interview Pedro Quintero at the scene of the fire. See deposition of Drees at p.12 and p.23.

15.    After the fire had been put out, Fire Marshal Drees, representatives of the Pennsylvania State Police as well as representatives of plaintiff's insurance carrier and others, agreed that everyone would get together on the morning of March 5, 2008 to decide how to proceed. See deposition of Drees at pp.66-68.

16.    Fire Marshal Drees testified that on the morning of March 5, 2008, he met with Tom Minnich, who is a representative of Kufta Associates, which is the entity that is serving as plaintiff's origin and cause expert. Drees testified that Kufta

4

recommended a demo company and that the demo company would have people on site on March 6, 2008 to finish the dig out.  See Drees deposition at p.68.

17.    Fire Marshal Drees testified that no demolition or delamination occurred on March 5, 2006.  See Drees deposition at pp.76-78.

18.    The subject heater which is the basis of plaintiff's claim in this matter, as well as the propane cylinder were discovered in the debris on March 6, 2008.  See Drees Deposition at p.92.

19.    Fire Marshal Drees also testified that Brad Schriver from Kufta Associates replaced Tom Minnich during the dig-out that occurred on March 6, 2008.  See Drees Deposition at p.138.  Mr. Schriver is serving as plaintiff's origin and cause expert.

20.    Bern Anthony was retained by Kufta Associates to perform demolition work at the scene.  See Deposition of Bern Anthony at p.15.  A copy Bern Anthony's deposition is attached hereto and marked as Exhibit "B".

21.    Bern Anthony testified that he was at the scene at the direction of Kufta on March 5 and March 6, 2008.  See Anthony deposition at pp.15-17.

22.    Anthony testified that no excavation activities were performed on March 5, 2008.  See Anthony deposition at p.18.

23.    Anthony testified that he arrived at the fire scene on March 6, 2008 at approximately 8:00 a.m.  Anthony testified that he did not start demolition right away

as he was waiting for plaintiff's expert, Brad Schriver to arrive at the scene.   See Anthony deposition at p.23; p.70.

24.   Anthony testified that demolition activities began at 10:00 a.m. on the aforesaid date and further testified that his activities were being directed by Brad Schriver who is plaintiff's expert.  See Anthony deposition at p.71; p.80.

25.   Anthony testified that after the portion of the roof was removed as well as the front A-wall of the property, he went down in the hole, as the first floor had collapsed into the basement, and he testified that he became a miner looking for evidence and specifically looking for the heater.   See Anthony deposition at pp.42-43.

26.   Anthony went on to testify that Brad Schriver would tell him where to dig.  The building was made safe to dig late on the morning of March 6, 2008.  See deposition of Anthony at p.46; p. 55.

27.   Anthony testified that the subject heater was found after shoveling.  He testified that Brad Schriver authorized him to remove the heater.  Anthony removed the heater from the scene and took it to Mr. Schriver's office located at Kufta Associates.  See Anthony deposition at pp.78-79; p.50; pp.55-56.

28.   Bill Walsh is the executive adjuster assigned by CAUA to handle the subject claim and CAUA's subrogation interest. See Walsh Deposition at pp.10-15.

A true and correct copy of the Walsh deposition is attached hereto and marked as Exhibit "C".

29.     Walsh testified that they retained attorney Daniel deLuca, Esquire on March 4, 2008, the day of the fire. See Walsh deposition at p.22.

30.     On March 5, 2008, plaintiff's attorney Daniel deLuca authored a letter which was sent by fax to Adams Drywall c/o Jacob H. Ruhl, Inc., and Rhoads Development Corporation. A true and correct copy of the attorney deLuca's letter is attached hereto and marked as Exhibit "D".

31.     The aforesaid letter was not addressed to either Pedro Quintero or Quintero's insurance carrier, Northland Insurance Company.

32.     In the aforesaid letter of March 5, 2008, attorney deLuca indicates as follows: "A follow up inspection will take place in the next two days - tomorrow and Friday - at this property, and you and/or your carrier are invited to attend. Either way, please know that due to the dangerous condition of the property, it is expected that the repair/demolition efforts will begin soon, so time is of the essence here.

33.     The provisions of attorney deLuca's letter clearly led all addressees to believe that the property would be available for inspection before it was repaired and/or demolished on both March 6 and March 7, 2008.

34.     As per the testimony of Bern Anthony and Fire Marshal Drees referenced above, it is clear that demolition occurred on the morning hours of March

6, 2008 and the subject heater was removed from the scene during the afternoon hours of March 6, 2008, contrary to the provisions of attorney deLuca's letter.

35.    Throughout the testimony of Bill Walsh, it is evident that plaintiffs are taking the position that the property was unsafe and that repairs and/or demolition had to begin before March 7 2008.  Despite this knowledge and the circumstances, attorney deLuca made no attempt to contact the parties referenced in the letter of March 5, 2008 nor did anyone make any attempt to contact either Quintero or Quintero's insurance carrier before the dig-out that occurred on March 6, 2008.  See deposition of Bern Anthony and deposition of Bill Walsh.

36.    There was never any follow up communication from either attorney deLuca nor Mr. Walsh of CAUA concerning the change in plans with regard to the demolition and dig-out that occurred on March 6, 2008.

37.    Michael Moyer is an origin and cause expert retained by Adams Drywall to investigate the circumstances of the subject fire.  He testified that he was retained by Adams' insurer, Penn National on March 6, 2008.  See deposition of Moyer at p.10.  A true and correct copy of Moyer's deposition is attached hereto and marked as Exhibit "E".

38.    Mr. Moyer testified that he was sent a copy of attorney deLuca's letter of March 5, 2008 and in response to that, contacted attorney deLuca's office at 12:30

p.m. on March 6, 2008. He was then directed by Stacy at attorney deLuca's office to contact Bill Walsh of CAUA. See Moyer deposition at pp.15-16.

39.     Mr. Moyer contacted Bill Walsh at 12:40 p.m. on March 6, 2008 and was advised by Walsh that evidence would be removed from the scene later that day, March 6, 2008. See Moyer deposition at pp.18-19.

40.     Mr. Moyer testified that he arrived at the scene at approximately 4:30 p.m. and present at the scene was Brad Schriver, plaintiff's expert who directed him to Bill Walsh. It appeared to Mr. Moyer that demolition work had already occurred. See Moyer deposition at pp.21-24.

41.     Mr. Moyer had the opportunity to inspect the fire scene after demolition occurred but was unable to find the heater that plaintiff alleges caused the fire. He subsequently learned that the heater was in the back of Bern Anthony's truck. See Moyer deposition at pp.26-27.

42.     Mr. Moyer testified that it was important as part of his investigation to inspect the heater in the exact spot it was found because it would give him an idea where the heater was located at the time of the fire and would also allow him to make observations of the heater in regards to the fire intensity and movement patterns toward the heater. See Moyer deposition at p.36.

43.   Mr. Moyer went on to testify that the modification of the scene was going to negatively affect his ability to make a determination of origin and cause of the fire and to identify ignition sources.   See Moyer deposition at p.41.

44.   Finally, Mr. Moyer testified that he was unable to reach an opinion of origin or cause because of the scene alteration and contamination.   See Moyer deposition at pp.126-127.   Additionally, a copy of Mr. Moyer's expert report is attached hereto and marked as Exhibit "F".

45.   By letter dated March 10, 2008, Mark Romah from Penn National Insurance placed both Pedro Quintero as well as Quintero's insurer, Northland Insurance Company on notice of the potential claim against Quintero.   A true and correct copy of the aforesaid letters are attached hereto and marked as Exhibit "G".

46.   As reflected above, it is clear that the scene had been substantially altered and contaminated before Quintero received Romah's letter of March 10, 2008.

47.   Once it received notice of the claim, Northland Insurance Company contacted John Bethel as its origin and cause expert.   As reflected in the attached report of Bethel, he was also unable to determine an origin and cause of the fire due to scene contamination and alteration.   A true and correct copy of Bethel's report is attached hereto and marked as Exhibit "H".

48.    In accordance with the case management order issued in this case,

plaintiff provided defendants with copies of various expert liability reports, one of

which expressed the following opinion as to the "cause" of the fire:

> "Upon completion of the excavation of the basement level,
> the only heat source capable of igniting a fire were
> identified as the electrical system and the propane-fired
> heater.    In reviewing reports by Larry Wharton and
> Michael Wald/Raymond Sofield, it is evident that they
> were able to successfully conclude that the fire was not the
> result of an electrical failure. In conclusion, based on the
> scene examination and information learned during the
> course of the investigation, it is the opinion of this
> investigator that the cause of the fire was attributed to the
> improper use of the propane-fired portable heater that was
> left energized overnight for the curing of drywall on the
> first floor level of 417 Park Drive.".

Report of Bradley A. Schriver, Kufta Associates (September 14, 2010) attached

hereto and marked as Exhibit "I".

49.    Defendant Quintero and his insurance carrier, Northland, are severely

prejudiced by the fact that they were not notified of their right to inspect the fire

scene before it was contaminated and disturbed.    It is evident in the record that

Quintero and his insurance carrier were not placed on notice of the claim until March

10, 2008 and were never placed on notice of the fact that the scene would be

demolished and contaminated prior to their opportunity to inspect the scene.

50.    Even had Quintero been one of the addressees in attorney deLuca's

letter of March 5, 2008, it is still clear that Quintero and his insurance carrier would

be prejudiced in light of the fact that the contents of attorney deLuca's letter were misleading and even had Quintero's expert appeared at the scene in the afternoon of March 6, 2008, it would have already been contaminated and disturbed as evidenced by the testimony of Michael Moyer.

51.    It is evident from Fire Marshal Drees' testimony, that Quintero was present on the scene on the day of the fire, and therefore, there is no reasonable basis by which CAUA could not have learned of the identity of Quintero and placed him and/or his insurance carrier on notice of their right to inspect the property before demolition occurred.

52.    It is clear that the only party that had the chance to inspect the scene before contamination was Mr. Schriver as he is the only expert retained that can formulate an opinion as to the cause of the fire.

53.    It is clear that the scene could have been preserved until all parties had the chance to inspect the scene before contamination.  The testimony referenced above clearly reflects that the scene was left intact on March 5, 2008, thereby undercutting plaintiff's argument that the scene had to be altered because of dangerous conditions.

54.    The Third Circuit has established the following tests to determine whether and what type of spoliation sanctions are appropriate:

(1)     The degree of fault of the party who altered or destroyed the evidence;

(2)     The degree of prejudice suffered by the opposing parties; and

(3)     Whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

See Schmid v. Milwaukee Electrical Tool Corp., 13 F.3d 76 (3rd Cir. 1994).

55.     The Court can consider a variety of sanctions if it finds plaintiffs at fault for spoliation of evidence. The sanctions can include an adverse jury inference, preclusion of testimony, and the ultimate sanction, dismissal of the case. Under Pennsylvania law, it is appropriate to impose a case dispositive sanction if the destruction of evidence is sufficiently deliberate and prejudicial that no lesser sanction is meaningful. Tenaglia v. Procter & Gamble, Inc., 737 A.2d 306 (Pa. Super. 1999).

56.     Defendant Quintero is severely prejudiced in this matter because his expert has no ability to rebut the conclusions of plaintiff's expert due to scene contamination and alteration. There can be no greater degree of prejudice. If the Court were to preclude the testimony of plaintiff's expert, Brad Schriver, then plaintiff would not have the ability to prove origin and cause of the fire, and therefore, summary judgment would be appropriate under that circumstance as well.

57.   Defendant Quintero submits that plaintiff should be subject to the ultimate sanction of dismissal of its case because of the spoliation of evidence, or in the alternative, the testimony of Bradley Schriver should be concluded, thereby making the entry of summary judgment in favor of defendant Quintero appropriate under either theory.

WHEREFORE, Defendant, Pedro Quintero, respectfully requests this Honorable Court grant his motion and enter the attached Court Order.

Respectfully submitted,

**WILLIAM J. FERREN & ASSOCIATES**

By:_____

**ANDREW J. KEENAN, ESQUIRE**
**Attorney for Defendant, Pedro Quintero**

14